Robert S. Green (State Bar No. 136183)
James Robert Noblin (State Bar No. 114442)
**GREEN & NOBLIN, P.C.**
2200 Larkspur Landing Circle, Suite 101
Larkspur, CA  94939
Telephone:  (415) 477-6700
Facsimile:  (415) 477-6710
Email:  gnecf@classcounsel.com

*Attorneys for Plaintiff*

[Additional counsel listed on signature page]

# UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DEBORAH A. FIESER, derivatively on behalf of XOMA CORPORATION,<br><br>                    Plaintiff,<br><br>vs.<br><br>W. DENMAN VAN NESS, WILLIAM K. BOWES, JR., PETER BARTON HUTT, JOSEPH M. LIMBER, KELVIN M. NEU, PATRICK J. SCANNON, JOHN VARIAN, TIMOTHY P. WALBERT, PAUL D. RUBIN AND JACK L. WYSZOMIERSKI,<br><br>                    Defendants.<br><br>and,<br><br>XOMA CORPORATION,<br><br>                    Nominal Defendant. | Case No.:<br><br>**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

xoma2

**INTRODUCTION**

1.     Plaintiff (defined below) alleges upon personal knowledge as to herself and the following based upon the investigation of Plaintiff's counsel, which included, among other things, a review of United States Securities and Exchange Commission ("SEC") filings, reports, press releases and other publicly-available information regarding the Company.

2.     This is a verified shareholder derivative action brought on behalf of Nominal Defendant XOMA Corporation ("XOMA" or the "Company") against current and former members of its Board of Directors (the "Board") and certain of its executive officers.  This action seeks to remedy Defendants' (defined below) breaches of fiduciary duties and other violations of the law that occurred from November 6, 2014 through the present (the "Relevant Period").

3.     XOMA is an unprofitable 30-year-old biotechnology company.  The Company has incurred operating losses since its inception and as of September 30, 2015, it had an accumulated deficit of $1.2 billion and expects operating losses and negative cash flows to continue for the foreseeable future.

4.     According to its SEC filings, XOMA discovers and develops innovative antibody-based therapeutics. Specifically, the Company combines a portfolio of late-stage clinical programs and research activities to develop innovative therapeutic antibodies that it intends to commercialize. XOMA focuses its scientific research on allosteric modulation, which offers opportunities for new classes of therapeutic antibodies to treat a wide range of human diseases.

5.     The Company's lead drug therapeutic antibody product is gevokizumab (formerly XOMA 052), a humanized antibody that modulates the inflammatory cytokine interleukin-1 beta (IL-1 beta). The Company's success is inexorably and directly linked to the success of and  obtaining timely U.S. Food and Drug Administration ("FDA") approval of gevokizumab.

6.     XOMA initiated three clinical trials to evaluate gevokizumab for the treatment of, among other things, Behçet's disease uveitis, a multisystem inflammatory disorder most

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

xoma2

commonly involving the eyes, which could lead to blindness.  Among the three trials is the Phase 3 EYEGUARD-B study for patients with Behçet's decease uveitis outside of the United States. The objective of the first part of this study was to demonstrate the superiority of gevokizumab, as compared to placebo, on top of the current standard of care (immunosuppressant therapy and oral corticosteroids) in reducing the risk of Behçet's disease uveitis exacerbations and to assess the safety of gevokizumab.

7.    During the Relevant Period, Defendants caused the Company to repeatedly make material representations concerning the imminent commercialization of gevokizumab, its potential success and the potential for a Biologic License Application ("BLA") submission requesting approval to commence commercial sales.  Specifically, Defendants disseminated overly robust statements that caused investors to believe that the Phase 3 study would be concluded successfully and that approval from the FDA would then be sought.

8.    On May 28, 2015, XOMA announced that it had reached its target exacerbation event as specified in the gevokizumab study, causing an increase in trading and leading to nearly an 8% jump in the Company's share price on the day of the news.

9.    However, on July 22, 2015, XOMA revealed that the study did not meet the primary endpoint of first acute ocular exacerbation. On this news, XOMA stock fell over 79%. In August 2015, XOMA announced its intention to end the EYEGUARD global Phase 3 program.

10.    Defendants' conduct was extremely reckless, and has resulted in substantial damages to XOMA and its stockholders.  Defendants have also exposed the Company to civil liability as a result of a securities fraud class action lawsuit (the "Securities Class Action") pending against the Company and certain of its senior executive officers.  The damages to the Company include, among other things, investigatory and litigation costs, including costs for defending the Company in the Securities Class Action.

11.    Plaintiff brings this derivative action to: (a) recover damages against the Defendants for the benefit of the Company; and (b) require the Company to reform and improve

its corporate governance and internal procedures to protect XOMA and its shareholders from a repetition of the damaging events described below.

**JURISDICTION**

12.     This Court has jurisdiction over all claims asserted herein pursuant to 28 U.S.C. §1332(a)(2), because complete diversity exists between Plaintiff and each defendant, and the amount in controversy exceeds $75,000.  This action is not a collusive action designed to confer jurisdiction on a court of the United States that it would not otherwise have.

**VENUE**

13.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(a) because a substantial portion of the transactions and wrongs complained of herein, including Defendants' participation in the wrongful acts detailed herein, occurred in this District.  Further, Defendants regularly conduct business in this District and/or have received substantial compensation in this District by engaging in numerous activities and conducting business here, which had an effect in this District.

**INTRADISTRICT ASSIGNMENT**

14.     As further alleged below, a substantial part of the events or omissions which give rise to the claims herein occurred at the location of the nominal Defendant at 2910 Seventh St., Berkeley, California.  Accordingly, pursuant to Local Rule 3-2[c], intradistrict assignment is proper in either the San Francisco or Oakland divisions of this Court.

**PARTIES**

15.     Plaintiff Deborah A. Fieser ("Plaintiff") is a current shareholder of XOMA and has continuously held XOMA stock during the Relevant Period through the present.  Plaintiff is a citizen of Florida.

16.     Nominal Defendant XOMA is a Delaware corporation with its principal executive offices located at 2910 Seventh St., Berkeley, California 94710.

17.     Defendant W. Denman Van Ness ("Van Ness") has served as a director since October 1981 and was appointed Chairman of the Board in August 2011.  At the time the Company filed its Schedule 14-A with the SEC on April 10, 2015, Van Ness was as a member

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

of the Compensation and Audit Committees.  Upon information and belief, Van Ness is a citizen of California.

18.     Defendant William K. Bowes, Jr. ("Bowes") has served as a director since February 1986. Upon information and belief, Bowes is a citizen of California.

19.     Defendant Peter Barton Hutt ("Hutt") has served as a director since May 2005. Upon information and belief, Hutt is a citizen of Washington, D.C.

20.     Defendant Joseph M. Limber ("Limber") has served as a director since December 2012.  At the time the Company filed its Schedule 14-A with the SEC on April 10, 2015, Limber was a member of the Compensation Committee.  Upon information and belief, Limber is a citizen of California.

21.     Defendant Kelvin M. Neu ("Neu") served as a director from July 2012 through May 2015.  Upon information and belief, Neu is a citizen of New York.

22.     Defendant Patrick J. Scannon ("Scannon") is one of the Company's founders and has served as a director since the Company's formation in 1981.  Scannon became Executive Vice President and Chief Scientific Officer in February 2011.  Defendant Scannon previously served as the Company's Chief Medical Officer from March 2009 to February 2011.   Upon information and belief, Scannon is a citizen of California.

23.     Defendant John Varian ("Varian") was appointed Chief Executive Officer ("CEO") in January 2012 after serving as Interim CEO since August 31, 2011.  He has served as a director since December 2008.  Upon information and belief, Varian is a citizen of California.

24.     Defendant Timothy P. Walbert ("Walbert") has served as a director since November 2010.  At the time the Company filed its Schedule 14-A with the SEC on April 10, 2015, Walbert was the Chairman of the Audit Committee.  Upon information and belief, Walbert is a citizen of Illinois.

25.     Defendant Jack L. Wyszomierski ("Wyszomierski") has served as a director since August 2010.  At the time the Company filed its Schedule 14-A with the SEC on April 10, 2015, Wyszomierski was Chairman of the Compensation Committee and a member of the Audit Committee.   Upon information and belief, Wyszomierski is a citizen of Pennsylvania.

26.     Defendant Paul D. Rubin ("Rubin") was appointed as XOMA's Chief Medical Officer and Senior Vice President of Research and Development in June 2011.  Upon information and belief, Rubin is a citizen of Nevada.

27.     Defendants Van Ness, Bowes, Rubin, Hutt, Limber, Neu, Scannon, Varian, Walbert and Wyszomierski are collectively referred to herein as the "Individual Defendants." XOMA and the Individual Defendants are sometimes referred to herein as the "Defendants."

## DEFENDANTS' DUTIES

28.     By reason of their positions as officers and/or directors, and fiduciaries of XOMA and because of their ability to control the business and corporate affairs of XOMA, Defendants owed XOMA and its shareholders fiduciary obligations of good faith, loyalty, and candor; and were and are required to use their utmost ability to control and manage XOMA in a fair, just, honest and equitable manner.  Defendants were and are required to act in furtherance of the best interests of XOMA and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interests of benefit.  Each director and officer of the Company owed and owes to XOMA and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing.

29.     Defendants, because of their positions of control and authority as directors and/or officers of XOMA, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.  Because of their advisory, executive, managerial, and directorial positions with XOMA, each of the Defendants had knowledge of material non-public information regarding the Company.

30.     To discharge their duties, the officers and directors of XOMA were required to exercise reasonable and prudent supervision over the management, policies, practices and controls of the Company.  By virtue of such duties, the officers and directors of XOMA were required to, among other things:

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

xoma2

(a)      Exercise good faith to ensure that the **affairs of the Company were conducted in an efficient, business-like manner so as to make it possible to provide the highest quality performance of the Company's business;**

(b)      Exercise good faith to ensure that the **Company was operated in a diligent, honest and prudent manner and complied with all applicable federal and state laws, rules, regulations and requirements; and**

(c)      When put on notice of problems with the Company's business practices and operations, exercise good faith in taking appropriate action to correct the misconduct and prevent its recurrence.

## SUBSTANTIVE ALLEGATIONS

**Background of the Company and its Clinical Drug Trials**

31.      XOMA was founded in 1981 and has never earned an operating profit or marketed a drug of its own.  It has managed to burn through more than approximately $700 million raised from investors and other pharmaceutical companies.

32.      XOMA's repeated attempts at drug commercialization have been unsuccessful and it has had several setbacks in drug development.  At the end of the 1980s, the Company was in advanced testing of a drug to treat sepsis, a potentially fatal reaction by the body to bacterial infection.   However, the drug failed to pass the statistical tests and did not help as many patients as it should have for statistical significance. XOMA did not have the information or the tools to enable development of a clinical laboratory test that would pinpoint a subgroup of patients who would benefit from the drug or be harmed by it.

33.      XOMA then concentrated on a new drug, bactericidal/permeability-increasing protein, or BPI, a bacteria-fighting substance made by certain human white blood cells.  But in 2000, the FDA told XOMA that the data was not good enough for approval to treat meningococcemia, a deadly bacterial infection that largely afflicts children and can kill them within hours. Many of the patients died before they even received the drug, so the trials XOMA conducted could not demonstrate that the drug increased patients' survival rates.

xoma2

34.     In 2004, a derivative of BPI failed in a midstage clinical trial as a treatment for acne. XOMA's management said they thought that the drug would have worked had it penetrated the acne lesions better. For some XOMA investors, that was the last straw; the company's stock sank, briefly falling below $1 in April 2005.

35.     XOMA then concentrated its efforts on Genentech's request to help it develop a new psoriasis drug, Raptiva.   **XOMA was to pay 25 percent of the costs and share 25 percent of the profits associated with Raptiva.** A chain reaction of unfortunate events began when XOMA's management at the time miscalculated its financial capability with regard to co-developing this drug with Genentech. The decision to share in the expenses ended up obliging XOMA to surrender to Genentech the rights to Raptiva, in exchange for a one-digit percentage of the royalties on the drug's sales. To make things worse, an increasing number of patients receiving the drug developed progressive multifocal leukoencephalopathy, a life-threatening complication that was not worth the reward for a psoriasis drug. Ultimately, the drug was withdrawn from the market.

36.     Another setback occurred when one of XOMA's drugs failed a Phase IIb diabetes study and news of the debacle quickly sent its stock plummeting, wiping out 37% of the Company's market value when announced. The trial was designed to track a drop in blood sugar among 421 diabetics assigned to either monthly injections of XOMA 052 or a placebo. The FDA failed to see any significant improvement in the drug group compared to placebo over six months of treatment.

37.     Ultimately, this set the stage for the Company's shift from diabetes into cardiovascular disease and a late-stage study for Behçet's uveitis, a condition that causes eye inflammation.

38.     In September 2014, the Company opened the EYEGUARD-US supplemental gevokizumab clinical study of Behçet's disease uveitis to patients in the United States. Data from the supplemental EYEGUARD-US study was designed to be used in one of several ways: as a required second pivotal study for an initial BLA submission, to provide further information

xoma2

related to U.S. physicians' and patients' experiences with gevokizumab, or for informational

purposes without being considered a pivotal study.

**False and Misleading Statements**

39.     On November 6, 2014, Defendants caused the Company to issue a press release

announcing the Company's financial results for the third quarter ended September 30, 2014.

Defendant Varian also represented that the Company was on track to file its BLA for

gevokizumab.  The press release stated in relevant part:

**XOMA Highlights Recent Achievements and Reports Financial Results for the Third Quarter of 2014**

BERKELEY, Calif., Nov. 6, 2014 (GLOBE NEWSWIRE) -- XOMA Corporation (Nasdaq:XOMA), a leader in the discovery and development of therapeutic antibodies, today reported its operational highlights and financial results for the quarter ended September 30, 2014.

**Recent Highlights**:

- Opened EYEGUARD-US, a clinical trial conducted at centers in the United States to study gevokizumab in patients with active or controlled Behçet's disease uveitis as part of a broader strategy to file the first Biologics Licensing Application (BLA) for gevokizumab in Behçet's disease uveitis.
- Opened the first of two pivotal Phase 3 gevokizumab studies in patients with pyoderma gangrenosum (PG), a rare neutrophilic dermatosis of painful expanding necrotic skin ulcers.
- Launched clinical development of XOMA 358, a fully human, allosteric monoclonal antibody that inhibits both the binding of insulin to its receptor and downstream insulin signaling. XOMA 358 is being evaluated for the treatment of non-drug-induced, endogenous hyperinsulinemic hypoglycemia (low blood glucose caused by excessive insulin produced endogenously).
- Concluded a license agreement with Texas A&M University System providing them with non-exclusive access to XOMA's patented design covering the flexible arrangement of mobile clean rooms within the manufacturing facility. This technology may become an important component of vaccine and medical countermeasure technologies.

"Our clinical development teams have been very productive in the past few months, opening both the EYEGUARD-US clinical study and the gevokizumab Phase 3 pyoderma gangrenosum study, while driving enrollment in our EYEGUARD-A and -C trials. They also exceeded our expectations with the launch of a Phase 1 study for XOMA 358, a novel monoclonal antibody discovered and developed at XOMA," stated John Varian, Chief Executive

xoma2

Officer of XOMA. "The EYEGUARD program, particularly the studies in Behçet's disease uveitis, puts us on the pathway to submit XOMA's first Biologics Licensing Application for gevokizumab, approval of which allows us to achieve our goal of transforming into a commercial organization marketing our products to the U.S. specialist prescriber.

"People who live with conditions affecting insulin signaling that results in excess insulin secretion need access to improved therapies to manage their disease. The start of our clinical activities for XOMA 358 in this area sends a clear signal of our commitment to develop new therapeutic options for patients with significant unmet medical needs," Mr. Varian concluded.

**Financial Results**

The financial results for 2014 reflect reduced reimbursements from SERVIER associated with gevokizumab development activities, as SERVIER met the initial $50 million cap of fully reimbursable NIU costs during the third quarter of 2013. XOMA now pays 50% of the gevokizumab development costs in NIU. The comparisons between the third quarters ended September 30, 2014 and 2013, reflect this development.

XOMA reported total revenues of $5.1 million in the third quarter ended September 30, 2014, compared with $6.3 million in the corresponding period of 2013. Reimbursements from our cost sharing collaboration with SERVIER are booked as revenues and are the primary driver of the $1.2 million decrease in revenue.

Research and development expenses for the third quarter of 2014 were $20.2 million, compared with $18.2 million in the corresponding period of 2013. The increase reflects higher clinical trial costs associated with XOMA's gevokizumab clinical development programs and increased personnel costs, including an increase in stock-based compensation, partially offset by decreased spending in external manufacturing related to the timing of activities performed and preclinical development. Selling, general and administrative expenses were $5.4 million in the third quarter of 2014, as compared to $5.2 million in the corresponding quarter of 2013. The increase reflects an increase in stock-based compensation.

For the third quarter of 2014, XOMA had a net loss of $14.4 million, compared with a net loss of $29.6 million for the third quarter of 2013, a decrease of $15.2 million. The net loss for the third quarter of 2014 included a non-cash gain of $5.7 million, whereas the third quarter of 2013 had a non-cash charge of $11.1 million, both of which were related to the revaluation of contingent warrant liabilities associated with fluctuations in the value of XOMA's stock price. Excluding these non-cash charges, net loss in the quarters ended September 30, 2014 and 2013, were $20.1 million and $18.5 million, respectively.

At September 30, 2014, XOMA had cash, cash equivalents, and short-term investments of $59.1 million. At December 31, 2013, the Company had cash, cash equivalents, and short-term investments of $121.6 million.

40.     On March 11, 2015, Defendants caused the Company to issue a press release announcing the Company's financial results for the fourth quarter and full-year ended December 31, 2014. The press release stated in relevant part:

**XOMA Highlights Recent Achievements and Reports Fourth Quarter and Full-Year 2014 Financial Results**

BERKELEY, Calif., March 11, 2015 (GLOBE NEWSWIRE) -- XOMA Corporation (Nasdaq:XOMA), a leader in the discovery and development of therapeutic antibodies, today reported its operational highlights and financial results for the quarter and year ended December 31, 2014.

**Recent Highlights**:

- Advanced all gevokizumab clinical studies, including initiating the Phase 3 EYEGUARD™-US study in U.S. patients with Behçet's disease uveitis and the Phase 3 study in patients with pyoderma gangrenosum.
- Completed enrollment of eight patients in the gevokizumab open-label proof of concept clinical trial in patients with active, non-infectious, anterior scleritis being conducted under Dr. Nida Sen's leadership at The National Eye Institute (NEI). The study objectives were to evaluate the safety and possible efficacy of gevokizumab in patients with active scleral inflammation at baseline. Although the study is still ongoing, 6 of the 8 study participants had a positive response in the first 16 weeks of gevokizumab treatment, based on a standardized scale. The Company will be working with NEI to design a possible multi-center controlled trial in this difficult to treat condition.
- Successfully completed the Phase 1 clinical study of XOMA 358, a fully human, allosteric monoclonal antibody that inhibits both the binding of insulin to its receptor and downstream insulin signaling, and presented the data at ENDO 2015. XOMA 358 is being evaluated for the treatment of non-drug-induced, endogenous hyperinsulinemic hypoglycemia (low blood glucose caused by excessive insulin produced endogenously).
- Strengthened the Company's financial position by raising $37.7 million, after deducting offering costs and out-of-pocket expenses, through the sale of units at a price of $4.94. Each unit includes a share of common stock and an accompanying warrant with a term of two years to purchase one additional share of common stock at an exercise price of $7.90 per share.

\*\*\*

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

"The fourth quarter was focused on driving enrollment in all five of our gevokizumab Phase 3 clinical trials, completing our first XOMA 358 clinical study, and putting the Company on a strong financial footing to allow us to achieve our goal of transforming XOMA into a commercial organization marketing our products to the U.S. specialist prescriber," stated John Varian, Chief Executive Officer of XOMA. "Our clinical and regulatory teams are compiling the documentation required to submit a Biologics Licensing Application, in anticipation of positive EYEGUARD-B clinical results and FDA interactions. By investing significant time now, we are doing all we can to expedite the process of requesting a pre-BLA meeting with FDA if we obtain positive primary endpoint results.

"With the encouraging proof-of-concept results in Scleritis, we have identified another potential indication for gevokizumab, and with the successful completion of the XOMA 358 Phase 1 study, we have demonstrated our ability to expand our product pipeline with another internally discovered compound that may lead to therapies for people who are living with conditions that are in clear need of new treatment options," Mr. Varian concluded.

**Financial Results**

The financial results for 2014 reflect reduced reimbursements from SERVIER associated with gevokizumab development activities, as SERVIER met the initial $50 million cap of fully reimbursable non-infectious intermediate, posterior, or pan-uveitis (NIU) and Behçet's diseases uveitis costs during the third quarter of 2013. XOMA now pays 50% of the gevokizumab development costs in NIU. The comparisons between the years ended December 31, 2014 and 2013, reflect this development.

XOMA recorded total revenues of $18.9 million for the twelve months ended December 31, 2014, compared with $35.5 million during the same period of 2013. For the three months ended December 31, 2014, XOMA recorded revenues of $4.3 million compared with $12.5 million in the corresponding period of 2013. The decrease in the full-year and fourth quarter 2014 revenues was due primarily to reduced revenue from our cost-sharing collaboration with SERVIER and reduced license fee revenue including the $7.0 million milestone payment received from Novartis in 2013.

Annual research and development (R&D) expenses for 2014 were $80.7 million compared to $74.9 million incurred in 2013. The increase in 2014 reflects increased activity under our gevokizumab clinical program, non-cash stock-based compensation cost of $3.2 million and additional salary and benefits costs of $1.6 million. For the three-month periods ended December 31, 2014 and 2013, R&D expenses were $19.4 million and $22.9 million, respectively. The decrease in the 2014 fourth quarter was due primarily to reduced external manufacturing costs and preclinical activities, partially offset by the increase in gevokizumab clinical costs.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

In 2014, selling, general and administrative (SG&A) expenses were $19.9 million compared to $18.5 million incurred during 2013, primarily reflecting increases of $2.5 million in non-cash stock-based compensation and $1.1 million in salaries and related personnel costs, partially offset by a decrease in professional services. SG&A expenses were $4.1 million in the fourth quarter of 2014, as compared to $5.0 million in the corresponding quarter of 2013. The decrease primarily reflects a reduction in consulting and professional expenses.

For the year ended December 31, 2014, XOMA had a net loss of $38.3 million compared with a net loss of $124.1 million in the year ended December 31, 2013. The full-year net losses in 2014 and 2013 included a $45.8 million gain and $61.0 million loss, respectively, in non-cash revaluation of contingent warrant liabilities, which resulted primarily from fluctuations in XOMA's stock price. Excluding those revaluations, the net loss for 2014 was $84.1 million, and the net loss for 2013 was $63.0 million. For the three months ended December 31, 2014, XOMA reported a net loss of $7.3 million, which included a gain of $12.1 million directly related to the revaluation of contingent warrant liabilities. Excluding the non-cash revaluation of contingent warrant liabilities, the net loss for the 2014 fourth quarter was $19.4 million. For the three months ended December 31, 2013, XOMA reported a net loss of $52.3 million of which $35.3 million was directly related to the revaluation of contingent warrant liabilities. Excluding the non-cash revaluation of contingent warrant liabilities, the net loss for the three months ended December 31, 2013, was $17.0 million.

On December 31, 2014, XOMA had cash and equivalents of $78.4 million. The Company ended December 31, 2013, with cash, cash equivalents, and short-term investments of $121.6 million. On December 8, 2014, the Company announced the closing of a registered direct offering of 8,097,165 units at a purchase price of $4.94, which includes a share of common stock and an accompanying warrant to purchase 8,097,165 shares of common stock at an exercise price of $7.90 per share. The Company received $37.7 million in net proceeds from the offering after deducting underwriting discount and offering expenses.

**2015 Guidance**

The Company expects its cash used in ongoing operating activities during 2015 will be approximately $60 - $65 million. The Company's principal expenditures are costs associated with its gevokizumab Phase 3 clinical programs. The guidance assumes license and contract-related revenue to be received during the course of the year.

41.     That same day during an earnings call, Defendant Rubin, speaking on behalf of the Company, expressed optimism with regard to the outcome of the gevokizumab EYEGUARD-B study.  When referring to the data gathered, Rubin made statements essentially ensuring the outcome would be successful.

-12-

42.     During a conference call held on May 6, 2015, Defendant Rubin, speaking on behalf of the Company, made misleading statements regarding the Company's BLA submission. Defendant Rubin stated in relevant part:

> When we have these results, our plan essentially is to – on the basis of this pivotal trial, which has significant power, is positive and because of the frequency of Behçet's uveitis, which is approximately 6,000, 7,000 patients in the United States, we believe a positive trial would warrant a request for BLA on the basis of that single pivotal trial initially.  So our intent is to first submit a BLA request for the Behçet's disease patients.  This single trial, we think, will allow – hopefully, will allow the FDA to accept this particular dossier, but we're also supplementing that by an ancillary study of patients with Behçet's uveitis in the United States, which is also ongoing.  And if need be, we will have that study to supplement the data from our larger EYEGUARD-B trial.

43.     The next day on May 7, 2015, the Company issued a press release announcing the Company's financial results for the first quarter ended March 31, 2015.  The press release stated in relevant part:

**XOMA Reports First Quarter 2015 Achievements and Financial Results**

BERKELEY, Calif., May 7, 2015 (GLOBE NEWSWIRE) -- XOMA Corporation (Nasdaq:XOMA), a leader in the discovery and development of therapeutic antibodies, today announced recent achievements and financial results for the first quarter ended March 31, 2015.

"During the first quarter of this year, we made significant progress toward achieving our goal of becoming a commercial organization," said John Varian, Chief Executive Officer of XOMA. "Servier is just one ocular exacerbation away from being able to close the EYEGUARD™-B study database and expects to reach the targeted ocular exacerbation event any day. If the study results are positive, we will perform an analysis of the full EYEGUARD-B dataset and plan to quickly request a pre-Biologics License Application meeting with the U.S. Food and Drug Administration."

He added, "We presented detailed results of our Phase 1 study of XOMA 358 at the recent ENDO Conference, which generated significant interest from the clinical community. We are in the process of assessing optimal indications to pursue in the Phase 2 development of this first-in-class compound that down-regulates the insulin receptor and its downstream signaling. We hope to expedite the clinical development of XOMA 358, as new treatment options are urgently needed for patients who are affected by the overproduction of insulin or atypical responses to insulin."

**Recent Achievements**

- One ocular exacerbation away from reaching the targeted number of exacerbations in the pivotal Phase 3 EYEGUARD-B clinical study of gevokizumab in Behçet's disease uveitis.
- Servier, XOMA's gevokizumab development partner, initiated a 370-patient Phase 2 study of gevokizumab in patients with diabetic nephropathy.
- Presented positive Phase 1 data from XOMA 358 at the ENDO Conference 2015. XOMA 358, a first-in-class, fully human, allosteric monoclonal antibody that down-regulates the insulin receptor, is being evaluated for the treatment of non-drug-induced, endogenous hyperinsulinemic hypoglycemia (low blood glucose caused by excessive insulin produced endogenously).
- Obtained a $20.0 million secured loan from Hercules Technology III, L.P., as lender, and affiliate of Hercules Technology Growth Capital, Inc., as agent. The Company used a portion of the proceeds to repay General Electric Capital Corporation's outstanding principal balance and interest of $5.5 million. The remaining proceeds will be used for general corporate purposes.
- Renegotiated the terms of Servier's loan agreement.
- Announced the promotion of Thomas Burns to Chief Financial Officer and the retirement of Fred Kurland.

**First Quarter 2015 Financial Results**

XOMA recorded total revenues of $2.7 million for the three months ended March 31, 2015, compared with $3.4 million during the corresponding period of 2014. The decrease in the first quarter 2015 revenues was due primarily to the receipt of a $0.5 million milestone payment related to an out-licensing arrangement received in the first quarter of 2014.

Research and development (R&D) expenses for the first quarter of 2015 were $20.0 million compared with $21.5 million in the corresponding 2014 period. The decrease reflects a reduction in external manufacturing costs offset by increased external clinical trial costs associated with XOMA's gevokizumab clinical development programs.

Selling, general and administrative expenses (SG&A) were $5.2 million for the three months ended March 31, 2015, compared with $5.3 million incurred during the same period in 2014.

For the first quarter ended March 31, 2015, XOMA had a net loss of $21.7 million compared with a net loss of $4.7 million in the quarter ended March 31, 2014. The net losses in the three months ended March 31, 2015 and 2014, included a $40,000 loss and $20.0 million gain, respectively, in non-cash revaluations of contingent warrant liabilities, resulting primarily from fluctuations in XOMA's stock price. Excluding those revaluations, the net loss for the three months ended March 31, 2015 was $21.7 million compared with a net loss of $24.7 million for the same reporting period in 2014.

On March 31, 2015, XOMA had cash, cash equivalents, and short-term investments of $67.5 million compared with $78.4 million at December 31, 2014.

**2015 Guidance**

The Company expects to spend approximately $60 million to $65 million in cash for ongoing operating activities during 2015. The Company's principal expenditures are costs associated with its gevokizumab Phase 3 clinical programs. The guidance assumes license and contract-related revenue to be received during the course of the year.

44.     That same day during the first quarter 2015 earnings call, Defendant Varian, speaking on behalf of the Company, represented that gevokizumab was "one exacerbation away from being able to close the EYEGUARD-B study database" and that investors should expect to "be getting to that final targeted exacerbation any day now."

45.     On May 28, 2015, Defendants caused the Company to issue a press release announcing that the Phase 3 EYEBGUARD™-B Study reached its target exacerbation event, which triggered the conclusion of the study.  Based on the overly positive statements previously disseminated, investors expected positive results and then a subsequent BLA submission.  The press release stated in relevant part:

**XOMA Announces Phase 3 EYEGUARD(TM)-B Study Reaches Target Exacerbation Event**

BERKELEY, Calif., May 28, 2015 (GLOBE NEWSWIRE) -- XOMA Corporation (Nasdaq:XOMA), a leader in the discovery and development of therapeutic antibodies, today announced that the gevokizumab Phase 3 EYEGUARD-B study, sponsored by its development partner Servier, reached its target exacerbation event as specified in the study design. The objective of the first part of this study is to demonstrate the superiority of gevokizumab, as compared to placebo, on top of the current standard of care (immunosuppressant therapy and oral corticosteroids) in reducing the risk of Behçet's disease uveitis exacerbations and to assess the safety of gevokizumab.

Servier now will begin the process of closing the clinical database and analyzing the data from this part of the study. Servier has provided a detailed schedule of the activities it will undertake to allow the locking of the database. The primary endpoint result is expected in approximately seven weeks. The trial is ongoing and remains double-masked for the extension period of the study.

The Phase 3 EYEGUARD-B study (A randomisEd, double-masked, placebo-controlled studY of the Efficacy of GevokizUmAb in the tReatment of patients with Behçet's Disease uveitis) was designed to enroll patients with a history of

Behçet's disease uveitis with ocular involvement of the posterior segment who have experienced a recent ocular exacerbation that was treated successfully with high doses of corticosteroids. Patients were randomized to either a 60 mg dose of gevokizumab or placebo administered subcutaneously once monthly on top of their current immunosuppressive and corticosteroid therapies. The primary endpoint is the time to first acute ocular exacerbation.

**THE TRUTH IS DISCLOSED**

46.     Before the market opened on July 22, 2015, Defendants caused the Company to issue a press release announcing that its pivotal Phase 3 clinical study evaluating gevokizumab missed the primary endpoint of time to first acute ocular exacerbation.  The press release stated in relevant part:

**XOMA Announces Results From Phase 3 EYEGUARD(TM)-B Study**

BERKELEY, Calif., July 22, 2015 (GLOBE NEWSWIRE) -- XOMA Corporation (Nasdaq:XOMA), a leader in the discovery and development of therapeutic antibodies, today announced the Phase 3 EYEGUARD-B study of gevokizumab in patients with Behçet's disease uveitis, run by its partner Servier, an independent French pharmaceutical research company driven by the pursuit of innovative drugs, did not meet the primary endpoint of time to first acute ocular exacerbation.

"Although the study did not achieve its main objective, we did see signals of drug activity such as preserved visual acuity, less severe ocular exacerbations and a reduced incidence of reported macular edema in patients treated with gevokizumab," said Paul Rubin MD, Senior Vice President Research and Development and Chief Medical Officer. "We will continue to work closely with our partner, Servier, and uveitis experts to conduct a thorough analysis of the data to fully understand gevokizumab's impact on several clinically relevant endpoints."

"The initial observations seen in the secondary endpoints are clinically important and meaningful to both clinicians and Behçet's disease uveitis patients," stated Dr. Ilknur Tugal-Tutkun, international coordinator for the EYEGUARD-B study and Professor of Ophthalmology, Head, Ocular Immunology and Uveitis Service at Istanbul University, Istanbul Faculty of Medicine, Department of Ophthalmology. "We look forward to learning more."

"In recent years, our public focus has been on gevokizumab. However, during that time, we have significantly advanced other assets in our pipeline including XOMA 358, for which we completed a positive Phase 1 study showing it is active in down-regulating the insulin receptor and shows potential in treating patients who experience endogenous over-production of

insulin, and XOMA 089, our late preclinical anti-TGFβ monoclonal antibody with potential in immuno-oncology and fibrosis," said John Varian, Chief Executive Officer of XOMA. "We will focus our efforts on creating value with these pipeline assets and reduce expenses where appropriate. While we continue to evaluate the data from EYEGUARD-B, the EYEGUARD-A and C studies, in the broader range of non-infectious uveitis, are still recruiting."

Gevokizumab appeared to be well tolerated in the trial. Adverse events were comparable between gevokizumab and placebo treated groups.

47.     As a result of the this news, XOMA's stock fell over 79%.

48.     On August 21, 2015, the Company, implemented a restructuring plan that included a 30% workforce reduction.  This resulted in the elimination of 58 positions throughout all areas of the Company. On September 29, 2015, the Company terminated an additional five employees.

49.     Furthermore, the Company was forced to cancel its contracts with clinical manufacturing organizations following the discontinuation of our EYEGUARD-B study.

### DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS FOR THE BOARD OF XOMA

50.     Plaintiff brings this action derivatively in the right and for the benefit of XOMA to redress injuries suffered and to be suffered by XOMA as a result of the breaches of fiduciary duty by the Defendants.

51.     Plaintiff will adequately and fairly represent the interests of XOMA and its shareholders in enforcing and prosecuting its rights.  This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

52.     As a result of the facts set forth herein, Plaintiff has not made a demand on the XOMA Board to institute this action against the Defendants.  Such demand would be a futile and useless act because the Board is incapable of making an independent and disinterested decision to institute and vigorously prosecute this action.

53.     Currently, there are eight directors on the Company's Board – Defendants Van Ness, Bowes, Hutt, Limber, Scannon, Varian, Walbert and Wyszomierski.  Defendants Van Ness, Bowes, Hutt and Scannon have served on the Board together for over ten years.  Indeed,

Defendants Van Ness, Bowes and Scannon have served on the Board together since the 1980s. Due to their long and extensive tenure on the Board, these Defendants are considered beholden to each other and have created a culture of undue deference to the Company's management.

**Likelihood of Substantial Liability of the Entire Board**

54.    Defendants knew that the Company's disclosures in its public filings and statements made on behalf of the Company were false because the Company's internal controls over financial reporting were clearly deficient as the Company now faces massive exposure and is at risk for future legal costs and potential civil liability.

55.    XOMA's Board approved and/or permitted the wrongs alleged herein and participated in efforts to conceal or disguise these wrongs from its shareholders or recklessly disregarded the wrongs complained of herein, and are therefore not disinterested parties.  Each of the Individual Defendants exhibited a systematic failure to fulfill his fiduciary duties, which could not have been an exercise of good faith business judgment and amounted to gross negligence and extreme recklessness.

56.    In the Company's SEC filings, the Director Defendants have admitted that gevokizumab is the Company's lead drug therapeutic antibody product.  Clearly, the Company's success is inexorably and directly linked to the success of and obtaining timely FDA approval of gevokizumab.  Thus, each of the Board members are charged with having knowledge of the issues described herein related to the Company's business and financial results and the resulting false and misleading financial statements and reports.

57.    Each of the Defendants exhibited a systematic failure to fulfill their fiduciary duties, which could not have been an exercise of good faith business judgment and amounted to extreme recklessness and bad faith.  Accordingly, demand on the Board is excused.

**Likelihood of Substantial Liability of the Audit Committee**

58.    The Audit Committee was directly responsible for overseeing and participating in XOMA's financial reporting process.  The Audit Committee members breached their fiduciary duties of due care, loyalty, and good faith because the Audit Committee failed to provide accurate financial disclosures during the Relevant Period.  Specifically, these

1  Defendants reviewed and approved the Company's press releases and SEC filings and

2  statements disseminated on behalf of the Company.  The Audit Committee members either

3  knew or should have known of these financial misrepresentations given their size, scope, and

4  blatancy, yet they failed to prevent or correct the false and misleading disclosures.  Such

5  conduct is not protected by the business judgment rule.

6  **Likelihood of Substantial Liability of the Compensation Committee**

7  59.     The Compensation Committee was responsible for determining executive

8  officers' salaries, bonuses and other compensation.  The Compensation Committee is

9  responsible for, *inter alia*, reviewing and making recommendations to the Board with respect to

10 the Company's incentive compensation plans and administration of such plans and reviewing

11 annually its compensation strategy to assure that the Company's objectives are advanced and

12 that executive are being rewarded in a manner that is consistent with the strategy of the

13 Compensation Committee.

14 60.     As members of the Compensation Committee, these Defendants approved

15 compensation plans that failed to align the Company's compensation practices in a manner that

16 fairly allocates the impact of risk among the Company's executives and its shareholders.

17 61.     These Defendants breached their fiduciary duties of due care, loyalty, and good

18 faith when they caused or permitted the Company to make compensation decisions that were

19 entirely based on fictitious results fueled by Defendants' wrongful activities.

20 **COUNT I**

21 **AGAINST ALL DEFENDANTS FOR BREACH OF FIDUCIARY DUTY**

22 62.     Plaintiff incorporates by reference and realleges each and every allegation set

23 forth above, as though fully set forth herein.

24 63.     As alleged in detail herein, each of the Defendants had a duty to ensure that

25 XOMA complied with applicable legal and regulatory requirements.

26 64.     Defendants violated their fiduciary duties of care, loyalty, and good faith by

27 causing or allowing the Company to engage in improper wrongdoing as alleged herein.  These

28 actions could not have been a good faith exercise of prudent business judgment.

-19-

65.     As a direct and proximate result of Defendants' foregoing breaches of fiduciary duties, the Company has suffered significant damages including, but not limited to, costs and expenses incurred in connection with defending XOMA and certain of the Defendants against private securities class action litigation arising from the improper conduct alleged herein.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment as follows:

A.     Against all Defendants and in favor of the Company for the amount of damages sustained by the Company as a result of Defendants' breaches of fiduciary duties for the amount of damages sustained by the Company;

B.     Directing XOMA to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect the Company and its shareholders from a repeat of the damaging events described herein and taking such other action as may be necessary to place before shareholders for a vote a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

C.     Awarding to XOMA restitution from Defendants and ordering disgorgement of all profits, benefits and other compensation obtained by the Defendants;

D.     Awarding to Plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, experts' fees, costs, and expenses; and

E.     Granting such other and further relief as the Court deems just and proper.

/////
/////
/////
/////
/////
/////
/////
/////

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

xoma2

## JURY DEMAND

Plaintiff demands a trial by jury.

DATED:  November 16, 2015                **GREEN & NOBLIN, P.C.**


                                         By:    /s/ James Robert Noblin
                                                James Robert Noblin

                                         Robert S. Green
                                         2200 Larkspur Landing Circle, Suite 101
                                         Larkspur, CA  94939
                                         Telephone: (415) 477-6700
                                         Facsimile: (415) 477-6710
                                         Email: gnecf@classcounsel.com

                                         -and-
                                         William B. Federman
                                         **FEDERMAN & SHERWOOD**
                                         10205 N. Pennsylvania Avenue
                                         Oklahoma City, OK 73120
                                         Telephone:  (405) 235-1560
                                         Facsimile: (405) 239-2112

                                         *Attorneys for Plaintiff*

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

## VERIFICATION

I, Deborah A. Fieser, declare that I have reviewed the Complaint ("Complaint") and I authorize its filing.  I have reviewed the allegations made in the Complaint, and to those allegations of which I have personal knowledge, I believe those allegations to be true.  As to those allegations of which I do not have personal knowledge, I rely on my counsel and their investigation and for that reason believe them to be true.  I further declare that I am a current holder, and have been a holder, of XOMA Corporation common stock during the relevant time period in which the wrongful conduct alleged and complained of in the Complaint was occurring.

_11/3/2015_____
Date

_____
(Signature of Investor)